**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                                       **No. 18-cr-2752 KG**

**JEFFREY GOEBEL,**

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER is before me on Defendant's Motion to Suppress [Doc. 17], filed on October 3, 2018. The United States responded on October 24, 2018. [Doc. 25]. Defendant replied on October 29, 2018. [Doc. 29]. The Honorable Kenneth J. Gonzales, United States District Judge, referred this matter to me for analysis and a recommended disposition. [Doc. 23]. I have considered the briefing, the relevant portions of the record, and the relevant law. Being otherwise fully advised in the premises, I recommend that Defendant's Motion to Suppress be **GRANTED IN PART AND DENIED IN PART**.

## I.    *PROCEDURAL BACKGROUND*

Defendant, a convicted felon, was arrested in Roswell, New Mexico, on June 22, 2017. The arresting officer found a handgun, ammunition, and holster near the location where Defendant was arrested. Defendant's DNA was later found on the holster.[1] Defendant spoke with the investigating officer, both before and after his arrest. The United States filed an Indictment

---

[1] The handgun had insufficient DNA on its surface for comparison.

charging Defendant with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). [Doc. 4]. Defendant now seeks to suppress the handgun, ammunition, and holster, as well as the statements he gave to the police.

I held an evidentiary hearing on November 1, 2018. The arresting officer, Alex Barleen, and Defendant's investigator, Horlando Lopez, were the only witnesses who testified at the hearing.

## II.     PROPOSED FINDINGS OF FACT

1.      Officer Alex Barleen has been a patrol officer with the City of Roswell Police Department ("RPD") for approximately four years. *See* Tr. at 4.

2.      Prior to becoming a patrol officer, Officer Barleen attended a 16-week training course at the New Mexico Law Enforcement Academy. The course taught legal topics, search and seizure, patrol, traffic stops, and various other areas of law enforcement. Officer Barleen also takes biennium training and in-department training. Before joining the RPD, he worked as a service aide for the police department. Officer Barleen has a high school diploma plus some college education. Tr. at 4–5.

3.      Officer Barleen was on duty during the early morning hours of June 22, 2017. *See* Tr. at 6–7.

4.      Officer Barleen was patrolling the area of South Michigan Avenue and West Hendricks Street in Roswell at approximately 2:45 a.m. when he heard dispatch radio traffic about a reckless driver driving with no headlights on. The only description of the vehicle was that it was a sedan. Tr. at 7.

5.     Around 3:34 a.m., Officer Barleen was at the intersection of West McGaffey Street and South Washington Avenue.  Tr. at 8, 52.

6.     As Officer Barleen was proceeding through the intersection and traveling east on McGaffey Street, he observed a vehicle approach the stop sign behind his vehicle.  Tr. at 8, 53.

7.     Officer Barleen noticed that the vehicle did not have its turn signal engaged when it approached the stop sign.  Then, after stopping at the stop sign, the driver activated the right-turn signal and turned right onto Washington Avenue.  *See* Tr. at 8.

8.     In Officer Barleen's experience, motorists who intend to turn at an intersection typically activate their turn signals prior to reaching the stop sign.  Tr. at 88–89.

9.     Officer Barleen considered the sudden signal and subsequent turn, in conjunction with the previous radio traffic regarding a reckless driver, suspicious.  Tr. at 88–89.

10.     Officer Barleen turned down an adjacent street and began following the vehicle as it made several subsequent turns.  He was following from approximately one block behind the vehicle and was unable to determine the number of occupants in the vehicle or their ethnicity.  Officer Barleen did not engage his overhead lights or sirens while following the sedan or at any point during the encounter.  *See* Tr. at 10, 87.

11.     The sedan, a silver Lincoln, made several turns and then pulled into the driveway of a residence at 1504 South Adams Avenue.  The driver parked the sedan with the tail end partially blocking the sidewalk and the front left tire partially on the residence's lawn.  The sedan's taillights remained on.  Tr. at 9–11, 21.

12.     Officer Barleen pulled over and stopped his patrol car approximately 100 feet north of the driveway to monitor the vehicle.  Tr. at 12.

13. He observed the driver exit the vehicle and walk quickly toward the house. Tr. at 12, 62

14. The driver, a tall male wearing a light-colored shirt, later identified as Defendant, walked past a van parked in the driveway, past the front porch of the home, and entered the back yard through a side gate. Tr. at 14.

15. Officer Barleen estimated that he had responded to approximately 30 to 45 police callouts in the area near 1504 Adams Avenue during the year preceding the incident. He described this area as having one of the "higher" crime rates in Roswell. Tr. at 13–14.

16. Officer Barleen found it suspicious that at such an early hour, in an area of Roswell known for high crime rates, with the vehicle parked askew, the Defendant bypassed the home's front door and entered the back yard through a closed gate. *See* Tr. at 68–69.

17. Officer Barleen then pulled his patrol unit forward and parked behind the parked sedan to monitor where the driver was proceeding and to read the vehicle's license plate. *See* Tr. at 14, 18, 20.

18. As Officer Barleen pulled forward, he observed Defendant walk past the side door and proceed around to the back of the house. Tr. at 19.

19. Officer Barleen's patrol car was blocking the driveway for about ten seconds. No one was in the vehicle's driver seat during that interval. Once Officer Barleen had determined the Lincoln's license plate number, he pulled his patrol unit back (north) and parked where his car was not blocking the driveway. Tr. at 20–21.

20. As Officer Barleen parked his vehicle, he activated a video camera attached to his headband to record his interactions with the public. *See* Tr. at 16–17; Pl.'s Ex. 1.

21.     As soon as Officer Barleen parked north of the driveway, the Lincoln's front passenger, later identified as Ricky Riley, exited the Lincoln and approached Officer Barleen's patrol unit.  *See* Tr. at 21.

22.     Officer Barleen testified that it is unusual for someone to get out of his vehicle and approach a patrol unit.  He testified that occupants of a stopped vehicle sometimes do that to distract his attention from somebody else on the scene.  Tr. at 22, 89–90.

23.     Officer Barleen then exited his patrol unit and spoke with Mr. Riley, who could not tell Officer Barleen the address of the residence.  Tr. at 22.

24.     While speaking with Mr. Riley, Officer Barleen observed that the van parked in the driveway had an open side door.  Tr. at 27.

25.     At this point, Defendant returned from the back of the residence and attempted to open the Lincoln's driver-side door.  Tr. at 22; Pl.'s Ex. 1 at 01:00.

26.     Officer Barleen told Defendant not to get back in the Lincoln and instructed Defendant and Mr. Riley to stand on the sidewalk, away from the vehicle.  *See* Tr. at 22–23; Pl.'s Ex. 1 at 01:03.

27.     Officer Barleen asked Mr. Riley and Defendant what they were doing at the residence and whether either man knew the address of the residence.  Pl.'s Ex. 1 at 00:53–02:23.

28.     Neither Defendant nor Mr. Riley was able to provide Officer Barleen with the address of the residence.  *See id.*

29.     While questioning Defendant and Mr. Riley, Officer Barleen told them that they did not "belong [t]here."  When asked to explain what he meant by this comment, Officer Barleen

testified that he meant that he did not believe they were authorized to be at that particular property. Tr. at 25; Pl.'s Ex. 1 at 02:23.

30.     Defendant then told Officer Barleen that they were at the residence to pick up a friend, Joseph, to take him to work.  Tr. at 71–72; Pl.'s Ex. 1 at 01:19.

31.     When questioned as to why he did not go to the front door, Defendant told Officer Barleen that Joseph had instructed him to go to the side door when he came to pick him up.  Pl.'s Ex. 1 at 02:48.

32.     Officer Barleen asked both men to produce identification.  Mr. Riley gave Officer Barleen his name but denied having any documents proving his identity.  Defendant gave Officer Barleen a wallet containing his identification card.  Tr. at 34; Pl.'s Ex. 1 at 03:10–03:30.

33.     As Officer Barleen spoke with Defendant and Mr. Riley, a second RPD officer arrived on scene to assist.  Officer Barleen identified that officer as Officer Jorge Arroyo. [2]  Tr. at 33–34; Pl.'s Ex. 1 at 03:43; *see* Pl.'s Ex. 2.

34.     Officer Arroyo was also wearing a video camera on a headband.  When Officer Arroyo walked up behind Officer Barleen, Defendant and Mr. Riley were facing Officer Barleen and standing on a public sidewalk.  Officer Barleen did not have his gun drawn.  *See* Pl.'s Ex. 2 at 00:45.

35.     After Officer Arroyo arrived, Officer Barleen was able to contact a second passenger sitting in the rear seat of the Lincoln.  *See* Pl.'s Ex. 1 at 03:50.

---

[2] The United States spells Officer Arroyo's name as both "Arroyos" and "Arroyo."  [Doc. 34] at 5, 7, 10.  Because the transcript spells his name as "Arroyo," I will refer to the second officer to arrive on the scene as "Officer Arroyo." *See* Tr. at 34.

36.     The rear-seat passenger verbally identified herself as Crystal Rosas but was unable to produce any documents to prove her identity.  *Id.* at 03:56–04:22.

37.     Ms. Rosas told Officer Barleen that she did not know why they were at 1504 Adams Avenue, did not know the residents of the home, and did not know Defendant or Mr. Riley.  She said that Defendant was giving her a ride to a house where she was staying.  When questioned further, she could not give Officer Barleen the address of the house where she claimed to be staying.  *Id.* at 04:15–05:01.  Ms. Rosas told Officer Barleen that Defendant was "really, really scared" when he pulled into the driveway.  *Id.* at 14:02.

38.     Officer Barleen radioed the three occupants' information to RPD dispatch and was notified that the Defendant was currently on probation and had prior felony convictions.  *Id.* at 05:14–06:06; Pl.'s Ex. 2 at 05:42–05:59.

39.     Officer Barleen did not see any lights on inside the house.  He went to the front door of the home and knocked several times.  A short time later the occupant, who identified herself as Eva Salazar, opened the front door.  *See* Tr. at 26, 28, 73, 76; Pl.'s Ex. 1 at 07:23, 09:00.

40.     Officer Barleen asked Ms. Salazar if she knew any of the occupants of the Lincoln, which she denied.  Pl.'s Ex. 1 at 09:12–09:22.

41.     Officer Barleen asked Ms. Salazar if anyone named Joseph lived at the home, which she denied.  *Id.* at 09:20.

42.     Ms. Salazar stated that she did not hear anyone knock at the residence prior to being awoken by Officer Barleen knocking.  *Id.* at 09:28.

43.     Officer Barleen questioned Ms. Salazar about the open door on the van in the driveway, to which Ms. Salazar responded that she believed the door was closed before she went to sleep. *Id.* at 09:26.

44.     Ms. Salazar gave Officer Barleen consent to search the van and her back yard. *See id.* at 09:54–10:12.

45.     Ms. Salazar told Officer Barleen that she did not wish to pursue charges of criminal trespass against the three occupants of the Lincoln. *Id.* at 10:13.

46.     After speaking with Ms. Salazar, Officer Barleen returned to where the Defendant, Mr. Riley, and the other RPD officer were standing. Officer Barleen then handcuffed Defendant. Officer Arroyo handcuffed Mr. Riley. Prior to handcuffing Defendant, Officer Barleen directed Defendant to put out the cigarette he had been smoking. *See id.* at 10:39; Pl.'s Ex. 2 at 08:08.

47.     As Officer Barleen handcuffed Defendant, Defendant asked why he was being detained. Officer Barleen told him that he was detaining him for suspicious activity, possible vehicle burglary, and criminal trespass. Defendant asked Officer Barleen why he would burglarize the van in the driveway. Officer Barleen said that "nobody belongs here at this house." Defendant repeated that he went to the house to pick up a friend for work, and Officer Barleen said that none of the occupants' stories matched. Officer Barleen said he saw Defendant "dart into the back" of the house. He told Defendant that Ms. Salazar informed him that the van's door was not open before Defendant arrived at the house. When Defendant denied opening the van's door, Officer Barleen said, "That doesn't make no sense to me." As Officer Barleen placed Defendant in a patrol unit, he advised Defendant that he was being detained but was not under arrest. Officer Barleen did not Mirandize Defendant before this conversation. *See* Pl.'s Ex. 1 at 10:39–12:25.

48.     Officer Barleen secured Defendant in a patrol unit.   Officer Arroyo secured Mr. Riley in a separate patrol unit.  Pl.'s Ex. 1 at 10:39; Pl.'s Ex. 2 at 08:08.

49.     Officer Barleen briefly searched the van for signs of criminal activity and, finding none, proceeded to the back yard of the residence.  *See* Tr. at 30.

50.     During his search of the back yard, Officer Barleen discovered a gate leading to the alley behind the yard.  The gate was ajar.  *See* Tr. at 31.

51.     Officer Barleen went through the gate into the alley.  He immediately observed a handgun in a holster lying on the ground in the middle of the alley, approximately six to seven feet from the gate.  The alley was a public alley with access from two directions.  *See* Tr. at 31–32, 87.

52.     Upon discovering the firearm, Officer Barleen called dispatch to ask for an additional RPD officer to help secure the firearm.  *See* Tr. at 32.

53.     After the gun had been collected as evidence, Officer Barleen returned to the front of the residence and notified Defendant of the discovery of the firearm.  He then placed Defendant under arrest for being a felon in possession of a firearm.  Pl.'s Ex. 4 at 00:54–05:07.

54.     Officer Barleen read Defendant his *Miranda* rights before asking him any questions about the firearm.  Defendant said that he understood his rights and agreed to speak with Officer Barleen.  Defendant denied possessing the firearm.  He denied any knowledge of the firearm whatsoever.  *Id.* at 01:20–04:30.

55.     This interview occurred while Defendant was handcuffed and sitting in the back of Officer Barleen's patrol vehicle.  The rear passenger door was open and Officer Barleen was standing outside.  Defendant appeared to be in his late twenties or early thirties and of at least average intelligence.  The interview took approximately six minutes.  Officer Barleen did not

threaten Defendant or subject him to physical punishment. Officer Barleen's gun was in its holster during the interview. *See* Tr. at 42–44; Pl.'s Ex. 4 at 01:20–06:37.

56. After securing the scene, Officer Barleen transported Defendant back to the RPD booking area. *See* Pl.'s Ex. 5.

57. During booking, Officer Barleen again read Defendant his *Miranda* rights before questioning him a second time regarding the firearm. Defendant again affirmed that he understood his rights and agreed to talk to Officer Barleen. Defendant persisted in his assertion that he never possessed the firearm. *Id.* at 00:55–01:05; 01:50–02:25.

58. During the second interview, Officer Barleen and Defendant were alone in a room big enough for 20–30 people. Defendant was not handcuffed. Officer Barleen's gun was locked in his patrol vehicle. Defendant had been in custody for approximately 90 minutes. The interview lasted approximately 12 minutes. Officer Barleen never threatened Defendant or subjected him to physical punishment. After Defendant denied possessing the gun for a second time, Officer Barleen allowed Defendant to use the telephone located in the booking room. *See* Tr. at 44–46; Pl.'s Ex. 5.

## III.     ANALYSIS

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261–62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)). The "proper inquiry is whether [the challenged action] violated the Fourth [and Fifth] Amendment rights of [the] criminal defendant making the challenge." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (first

and third alteration in original) (quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir.

1989)). "The proponent of a motion to suppress has the burden of adducing facts at the suppression

hearing indicating that his own rights were violated by the challenged search." *United States v.

Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quoting *Allen*, 235 F.3d at 489). The United States

bears the burden of proof by a preponderance of the evidence to show that the challenged action

did not violate the defendant's Fourth or Fifth Amendment rights. *United States v. Matlock*, 415

U.S. 164, 177 (1974). Finally, the Court views the evidence in the light most favorable to the

United States. *See, e.g.*, *United States v. Turner*, No. 13-40050-01-JAR, 2013 WL 5727404, at *9

(D. Kan. Oct. 22, 2013) ("While the Court is cognizant that it must view the facts in the light most

favorable to the Government, it may not draw inferences that are not supported by the record, nor

accept facts that are contrary to the record."); *United States v. Ortega*, No. 12-20580-CR-

MOORE/TORRES, 2012 WL 12894242, at *4 (S.D. Fla. Dec. 3, 2012) ("[V]iewing the facts

adduced at the suppression hearing in the light most favorable to the government . . . .").

    A.    *Officer Barleen's detention of Defendant did not violate the Fourth Amendment because he had reasonable suspicion to stop Defendant, and he did not unconstitutionally prolong the length of the* Terry *stop.*

Defendant argues that his detention was unlawful because Officer Barleen did not have

reasonable suspicion that Defendant had committed a crime. [Doc. 17] at 5–7; [Doc. 29] at 1–8.

Defendant also argues that Officer Barleen unconstitutionally prolonged the length of the stop by

detaining him after he explained that he stopped at the house to pick up a friend. [Doc. 17] at 7–

8. I disagree with each argument.

The police may detain a suspect when they have a reasonable suspicion that the suspect is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). A *Terry* stop does not occur unless the police make a show of authority which causes the suspect to believe she is not free to leave, and the suspect actually submits to the show of authority. *California v. Hodari D.*, 499 U.S. 621, 625–39 (1991); *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010). The parties agreed at oral argument that "the stop occurred at the time the officer told the Defendant to stand on the sidewalk." Tr. at 96. At that point, Officer Barleen made a show of authority by ordering Defendant to stay out of his car and stand on the sidewalk. Defendant submitted to this show of authority by standing where directed, which would indicate that he did not believe himself free to leave. Therefore, the *Terry* stop began when Officer Barleen ordered Defendant and Mr. Riley to stand on the sidewalk.[3] Whether Officer Barleen had reasonable suspicion to detain Defendant must be judged based solely on information he had at that point.

An officer may perform a *Terry* stop when "the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990)). "A determination of reasonable suspicion is based on 'an objective standard taking the totality of the circumstances . . . into account.'" *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007) (quoting *United States v. Johnson*, 364 F.3d

---

[3] The *Terry* stop did not begin when, as Defendant argues in his Reply, Officer Barleen briefly blocked the driveway with his car. *See* [Doc. 29] at 6. At that point, Defendant was not present in the driveway. He was in the back yard. So he did not submit to this alleged show of authority.

1185, 1189 (10th Cir. 2004)). Though an officer must have more than a hunch to have reasonable suspicion, she need not have proof by a preponderance of the evidence that a crime occurred, and she "need not rule out the possibility of innocent conduct." *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). When determining reasonable suspicion, the Court must "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (quoting *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996)). If the suspect's conduct justifying the stop was ambiguous, and could be the product of an innocent explanation, an officer does not violate the Fourth Amendment by detaining the suspect to resolve the ambiguity. *United States v. Eskridge*, 420 F. App'x 837, 843 (10th Cir. 2011) (unpublished).

Two relevant factors for determining if reasonable suspicion existed include the time of day that the suspicious activity occurred and the crime rate of the area in question. In *United States v. McHugh*, the Tenth Circuit held that reasonable suspicion existed for an officer to detain a person suspected of having a weapon in an apartment complex parking lot. 639 F.3d at 1254, 1258. The officer had responded to calls regarding criminal activity at the complex for years, including in recent months. *Id.* at 1257. Whether the area was "high-crime" weighed in favor of finding reasonable suspicion because "courts have repeatedly held that such a characteristic of the location of the stop is relevant to the [reasonable suspicion] analysis." *Id.* Additionally, because the incident occurred "late at night or early in the morning"—around 2:00 a.m.—the officer had more reasonable suspicion that the defendant was engaged in criminal activity. *Id.*; *see United States v.*

*Connor*, 699 F.3d 1225, 1231 (10th Cir. 2012) ("[T]he late hour lends weight to the reasonableness of the officers' suspicion.").

The Tenth Circuit similarly emphasized the area's crime rate in *United States v. Briggs*. There, the detention occurred in an area that the officers had routinely patrolled for high gang and drug activity. 720 F.3d 1281, 1286 (10th Cir. 2013). The officers had arrested persons in the area before for gang, weapons, and drug crimes. *Id.* Like *McHugh*, though the area's crime rate was not sufficient to give an officer reasonable suspicion, it weighed in favor of such a result. *Id.* Moreover, the defendant's evasive behavior contributed to reasonable suspicion. The defendant "suddenly changed course as the officers' vehicle came into view" and "increased [his] pace as the officers' vehicle approached." *Id.* Though not dispositive, evasive behavior—especially a "sudden change of direction and speed of travel upon contact with officers"—weighed in favor of finding reasonable suspicion. *Id.* The Tenth Circuit also relied on many other factors to find reasonable suspicion, including seeing the suspect grab at his waistline, watching the suspect and a companion split up, the suspect's nervous behavior, and seeing the suspect's companion flee. *See id.* at 1287–92. Like *McHugh*, the Tenth Circuit reviewed the totality of the circumstances to determine if reasonable suspicion existed.

In this case, Officer Barleen's observation of Defendant walking near the side door and back yard of a house at 3:30 a.m. gave him reasonable suspicion of criminal activity. Defendant never approached the front door, the most natural place for a person without criminal intentions to knock. Instead, he walked quickly to the back yard, bypassing the side door. Defendant's actions were consistent with someone intent upon committing a trespass or burglary, especially given the

late hour. This information provided Officer Barleen with reasonable suspicion that criminal activity was afoot.

The Court also finds that the incident occurred in a high-crime area. Officer Barleen testified that the neighborhood where he detained Defendant "is one of our higher[-crime] areas in town." Tr. at 14. In four years, Officer Barleen has responded to more than a hundred calls in the area for various crimes, including burglaries, shootings, and property crimes, much like how the officers in *Briggs* had previously arrested persons for various crimes in the area. Tr. at 13–14; *see Connor*, 699 F.3d at 1231 (finding persuasive the officers' testimony that they personally responded to crimes in an area and that the area is "one of the most dangerous [areas] in Denver"). Defendant argues that the neighborhood is "pretty close to" two schools, Tr. at 56, but schools may exist near a high-crime area. Defendant contends that "[t]his isn't the worst area in Roswell," Tr. at 56, but reasonable suspicion does not require that the area have the worst crime rate of all neighborhoods in town; it merely asks if the area is "high-crime."

Mr. Riley's conduct lends further credence to Officer Barleen's suspicion that the occupants of the car might be engaged in criminal activity. After Officer Barleen parked his car north of the driveway, Mr. Riley—without Officer Barleen asking—exited the Lincoln and approached the patrol car to speak with Officer Barleen. Officer Barleen testified, "From my previous experience with encounters with more than one suspect . . . when one suspect or one subject approaches an officer, it's sometimes to divert the attention away from somebody else on-scene." Tr. at 89–90. "It's unusual for people to get out and come towards my car." Tr. at 32. It was reasonable for Officer Barleen to suspect that Mr. Riley approached his patrol unit to distract him from Defendant. This factor therefore weighs in favor of a finding of reasonable suspicion.

Finally, Defendant's apparently evasive actions provided Officer Barleen with some reasonable suspicion. Officer Barleen testified that when Defendant first drove up behind his patrol car, Defendant suddenly stopped, turned away from the patrol car, and drove away quickly. Tr. at 8. This action mirrors the evasive behavior found to be suspicious in *Briggs*: a sudden change of direction and speed upon seeing an officer. Though Defendant claims his actions were consistent with a person travelling to the residence by the most direct route, Officer Barleen need not have eliminated every possible innocent explanation of Defendant's actions. Even if it was not suspicious for Defendant to turn onto Washington Avenue, it was suspicious for him to brake abruptly and drive quickly away from a patrol car. This factor therefore weighs in favor of finding reasonable suspicion.

Defendant argues that his and Mr. Riley's statements to Officer Barleen that they were at the house to pick up a friend should have dispelled any suspicion of criminal activity. [Doc. 17] at 8. But when Officer Barleen asked them for the address of the house, neither could provide it. *See* Pl.'s Ex. 1 at 00:50. Though people occasionally forget their friends' addresses, an officer need not eliminate all innocent explanations of suspicious activity before detaining a person. Similarly, though it is possible that, as Defendant argues, his friend worked at a 24-hour cheese factory, such a job is rare at best. *See* [Doc. 29] at 4. Regardless of whether he was there to pick up a friend, it was still suspicious for Defendant to bypass the front door and enter the back yard at 3:30 a.m. Because Defendant's explanation of why he was at the house was suspicious, that weighs in favor of reasonable suspicion.

Therefore, based on the totality of the circumstances, I recommend finding that Officer Barleen had reasonable suspicion that Defendant was committing criminal activity. Even if, as

Defendant argues, each of his actions could be explained by innocent conduct, I will "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Zubia-Melendez*, 263 F.3d at 1162 (quoting *McRae*, 81 F.3d at 1534).[4]

> 2.    *Officer Barleen did not unconstitutionally prolong the length of the* Terry *stop because he quickly investigated the scene.*

An officer does not unlawfully prolong the duration of a *Terry* stop if she "diligently pursued a means of investigation that was likely to confirm or dispel [her] suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The question is not whether the officer used the quickest or least intrusive means to investigate. *Id.* Rather, the question is whether "the police acted unreasonably in failing to recognize or pursue" an alternative means of investigation. *Id.*

Defendant argues that, after Defendant and Mr. Riley told Officer Barleen they were at the house to pick up a friend for work, Officer Barleen unreasonably prolonged the duration of the detention by ordering Defendant to stay on the sidewalk while he continued his investigation. [Doc. 29] at 7. Such an argument is inconsistent with the purpose of a *Terry* stop: to allow an officer to perform a limited investigation to confirm or dispel her reasonable suspicion of criminal activity. *See Terry*, 392 U.S. at 22–24. Once another officer arrived at the scene, Officer Barleen immediately searched the side area, back yard, and alley. His search lasted only a few minutes, and the entire detention lasted around 33 minutes. *See* Pl.'s Ex. 1, Ex. 3, and Ex. 4. Defendant offers no alternative means of searching that would have dispelled Officer Barleen's suspicion

---

[4] Defendant also argues that the "detention was the result of racial profiling." [Doc. 17] at 6. Defendant acknowledges that "the Supreme Court has held '[s]ubjective intentions [of law enforcement officers] play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.* (alterations in original) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Court will not depart from settled Supreme Court precedent by considering Officer Barleen's subjective intentions, especially because many other factors gave him reasonable suspicion here.

quicker.  I therefore recommend finding that Officer Barleen did not unconstitutionally prolong the *Terry* stop.

B.      *Officer Barleen violated the Fifth Amendment by interrogating Defendant after handcuffing him—but before Mirandizing him—on the sidewalk at the scene. Otherwise, no interrogation of Officer Barleen violated the Fifth Amendment.*

Defendant next argues that Officer Barleen violated the Fifth Amendment when he interrogated him.  He raises two arguments.  First, he contends that his sidewalk detention amounted to custodial interrogation, and that Officer Barleen's failure to Mirandize him at that point violated the Fifth Amendment.  [Doc. 17] at 8–10.  Second, he argues that any statements he made after Officer Barleen read him his *Miranda* warnings must also be excluded because he involuntarily waived his *Miranda* rights.  *Id.* at 10–13.  For the following reasons, I recommend finding that only part of Defendant's detention—after he was placed in handcuffs and before Officer Barleen first Mirandized him—amounted to custodial interrogation.  I also recommend finding that Defendant knowingly and voluntarily waived his *Miranda* rights after Officer Barleen Mirandized him.

1.      *Defendant was not in custody until Officer Barleen handcuffed him.*

If the police subject a person to custodial interrogation, they must first read the suspect her *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Whether a person is in custody depends on how the circumstances surrounding the interrogation "'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'"  *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)).  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on

freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

Courts look to a number of factors to determine whether the police subjected a suspect to the equivalent of a formal arrest. In *United States v. Ritchie*, the FBI "blocked the defendant's path [to get off of his premises] with their vehicles" and, without drawing their guns, told him to stay on the premises until another officer arrived. 35 F.3d 1477, 1479 (10th Cir. 1994). Two agents questioned the defendant inside his home about a recent robbery. *Id.* at 1479–80. The Tenth Circuit held that the defendant was not in custody. Though the FBI detained the defendant, "they never held him at gunpoint, handcuffed him, or otherwise used force or threat of force." *Id.* at 1485. Courts "'are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." *Id.* (quoting 1 Crim. Proc. § 6.6(e) (1984 & 1991 Supp.)). Moreover, only two agents interrogated the defendant; the FBI did not overwhelm the defendant with their presence. *Id.* Finally, that the agents never threatened or coerced the defendant suggested he was not in custody. *Id.*

In *United States v. Perdue*, the Tenth Circuit again emphasized the police-dominated circumstances surrounding a suspect's detention. 8 F.3d 1455, 1464 (10th Cir. 1993). There, two agents stopped the defendant's car as he drove to his property while over a dozen other officers searched a building on it. *Id.* at 1458. The agents questioned him at gunpoint and ordered him to lie face-down on the road. *Id.* at 1459. Police helicopters flew over the property. *Id.* at 1458. The Tenth Circuit held that the police should have Mirandized the defendant. Though "[t]he traditional view . . . is that *Miranda* warnings are simply not implicated in the context of a valid *Terry* stop," if the police "employ[] an amount of force that reached the boundary line between a permissible

*Terry* stop and an unconstitutional arrest, the officers created the 'custodial' situation envisioned by *Miranda*." *Id.* at 1464. The force used by the agents escalated the situation from a *Terry* stop to custody: the police forced the defendant out of his car at gunpoint, ordered him to lie on the ground, and helicopters hovered above. *Id.* Such actions are inconsistent with the typical *Terry* stop where no more than one or two policemen publicly stop someone using little or no force. *Id.*; *see Berkemer v. McCarty*, 468 U.S. 420, 436–40 (1984). Unlike *Ritchie*, where the FBI questioned the suspect inside his home and never drew their guns, in *Perdue* the police used significantly more force and questioned the face-down suspect on the road. A reasonable person would not feel free to leave given the level of force used by police. *Perdue*, 8 F.3d at 1464.

In this case, the circumstances surrounding Defendant's detention prior to being handcuffed did not rise to the level of custody that would necessitate *Miranda* warnings. Officer Barleen never used physical force against Defendant. He calmly asked Defendant to stand on the sidewalk. He never drew his gun or forced Defendant to the ground. This detention therefore does not approach the severe level of force in *Perdue*. Moreover, though the interrogation occurred early in the morning with no civilians outside, it still occurred in a public place, which is "at least [a] neutral surrounding[]" that would suggest to a reasonable person that he was not under arrest. *Ritchie*, 35 F.3d at 1485 (quoting 1 Crim. Proc. § 6.6(e)).[5] Like *Ritchie*, no more than two officers questioned Defendant during his detention on the sidewalk. He did not experience the police-dominated atmosphere of *Perdue*, where more than a dozen policemen plus police helicopters were at the scene. Finally, Officer Barleen only questioned Defendant at the sidewalk

---

[5] In fact, if Officer Barleen took Defendant at his word when he said he was at a friend's house, such familiar surroundings would objectively indicate that he was not in custody. *See* 2 Crim. Proc. § 6.6(e) (4th ed. 2017) ("[Q]uestioning has been held to be noncustodial where it occurred at the home of a friend or relative . . . ." (footnote omitted)).

for "several minutes." [Doc. 17] at 9. Such a short length of questioning weighs against finding that he was in custody. *See United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) (noting that a one-hour interrogation does not weigh toward finding that the suspect is in custody).

Defendant cites *United States v. Revels*, 510 F.3d 1269 (10th Cir. 2007), to argue that Officer Barleen placed him in custody when he told him to stand on the sidewalk. But *Revels* further proves that Defendant was *not* in custody at that point. In *Revels*, seven police officers forcibly entered the suspect's home at 6:00 a.m., handcuffed her, placed her face-down on the floor, and separated her from her family members. *Id.* at 1270–71. Though they questioned her in her own home, the significant force the officers used "belie[s] any conclusion that Revels' home . . . was the traditional comfortable environment that we normally would consider a neutral location for questioning." *Id.* at 1275–76. No such force existed at the sidewalk stop here. Only two officers questioned Defendant. The officers did not force Defendant to the ground. Nor did they separate Defendant from Mr. Riley as the police separated the suspect from her family in *Revels*. Defendant was therefore not in custody until he was handcuffed.

Defendant was in custody once Officer Barleen placed him in handcuffs. "When officers take highly intrusive steps to protect their safety, such as placing the person in handcuffs, in a police vehicle, or drawing weapons at them, an otherwise permissible stop under *Terry v. Ohio* will normally require warnings under *Miranda*." *United States v. Rodriguez*, 836 F. Supp. 2d 1258, 1291 (D.N.M. 2011); *see United States v. Glover*, 211 F. App'x 811, 814 (10th Cir. 2007) (unpublished) (holding that the defendant was in custody when the police handcuffed him and seated him in his house); *United States v. White*, 339 F. Supp. 2d 1165 (D. Kan. 2004) ("At the point that defendant was placed in handcuffs, the Court finds that she was in custody and should

have been given her *Miranda* warnings.").  A reasonable person in Defendant's position would not have believed that he was free to leave once he was placed in handcuffs.  The United States agrees: "[T]his Court should find that Officer Barleen was not required to give a *Miranda* warning *until Defendant was handcuffed*."  [Doc. 25] at 9 (emphasis added).  Officer Barleen made several statements after handcuffing Defendant, but before reading him his *Miranda* rights: "nobody belongs here at this house," "none of your stories match," "you dart[ed] into the back," and "[t]hat [story] don't make no sense to me."  Pl.'s Ex. 1 at 11:00–12:02.  Defendant responded to these statements.  *Id.*  Defendant argues that these statements constituted an interrogation.  *See* [Doc. 17] at 10 (stating that interrogation includes express questioning *and* other words or actions reasonably likely to elicit an incriminating response).  The United States offers no argument to the contrary.  Since Officer Barleen did not Mirandize Defendant until after he placed him in the patrol car, Defendant's statements in response to Officer Barleen's interrogation must be suppressed.[6]

Therefore, I recommend suppression of Defendant's statements made from 11:28–12:19 of Pl.'s Ex. 1.  I recommend suppressing no other statements.

### 2.    *Defendant knowingly and voluntarily waived his* Miranda *rights.*

Two components exist to a valid *Miranda* waiver.  First, the suspect must knowingly waive the rights: she must be fully aware of the nature of the rights being abandoned and the consequences of abandoning them.  *Berghuis v. Thompkins*, 560 U.S. 370, 383–86 (2010).  If a suspect has "prior experience with the criminal justice system," a knowing waiver becomes more

---

[6] Though some courts have held that if an officer tells a suspect she is not under arrest, that weighs in favor of finding she was not in custody, *see, e.g.*, *United States v. Peck*, No. 97-8122, 166 F.3d 1222, 1999 WL 33022, at *4 (10th Cir. Jan. 27, 1999), Officer Barleen only told Defendant that he was not under arrest *after* the alleged interrogation occurred.  *See* Pl.'s Ex. 1 at 12:05.

likely because "the concepts encompassed by *Miranda* [are] not foreign to him." *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004).

Second, the waiver "must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Berghuis*, 560 U.S. at 382 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A suspect waives her *Miranda* rights voluntarily by taking a course of conduct inconsistent with those rights. *Id.* at 385–86. A suspect's *Miranda* waiver becomes involuntary when "his will was 'overborne by the circumstances surrounding the giving of a confession.'" *United States v. Varela*, 576 F. App'x 771, 777 (10th Cir. 2014) (unpublished) (quoting *Smith*, 379 F.3d at 934). Relevant factors include "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). In *Berghuis*, the suspect—after being read her *Miranda* rights—answered a detective's question about whether he "prayed to God for forgiveness for shooting the victim." *Id.* at 386. The Supreme Court held that answering the question represented a course of conduct indicating waiver because, had the defendant wished to remain silent, he "could have said nothing . . . or he could have unambiguously invoked his *Miranda* rights and ended the interrogation." *Id.*

Here, Defendant knowingly and intelligently waived his *Miranda* rights. Officer Barleen twice read Defendant his *Miranda* rights: once at the scene and once in the station house. Defendant also has two prior felony convictions. Tr. at 46. He has had sufficient prior experience with the criminal justice system to know the nature of his *Miranda* rights and the consequences of

waiving them.  Defendant told Officer Barleen that he had been read *Miranda* rights before, and he stated he was still willing to talk.  Pl.'s Ex. 4 at 01:25.  He thus knowingly waived his rights.

Defendant waived his *Miranda* rights voluntarily by speaking with Officer Barleen after hearing his rights.  Defendant admits that, after Officer Barleen "advis[ed] Mr. Goebel of his *Miranda* rights," he "did not invoke his right to counsel and he continued to talk to Officer Barleen." [Doc. 17] at 10.  Just as the defendant in *Berghuis* voluntarily waived his *Miranda* rights by answering a potentially incriminating question, Defendant voluntarily waived his rights by answering questions about his actions at 1504 Adams Avenue.  The *Smith* factors also weigh in favor of finding Defendant's waiver voluntary.  Defendant was 31 years old at the time of the incident.  [Doc. 25] at 9.  Defendant "appear[ed] to be of at least average intelligence."  Tr. at 42. Officer Barleen twice informed Defendant of his *Miranda* rights.  Officer Barleen never used or threatened Defendant with violence.  Defendant thus voluntarily waived his *Miranda* rights.

Even if Officer Barleen's threat to charge Defendant with vehicle burglary, criminal trespass, reckless driving, and other crimes could be considered "psychological coercion" (which I do not find), [Doc. 17] at 12, it is clear that Defendant's will was not overborne: he repeatedly and consistently denied any wrongdoing.  In *Hart v. Attorney General of Florida*, a case relied upon by Defendant, the Eleventh Circuit found that police deception made Defendant's *Miranda* waiver unintelligent and involuntary.  323 F.3d 884, 894–95 (11th Cir. 2003).  There, the suspect asked for the pros and cons of hiring a lawyer, which "indicate[s] that Hart did not fully understand his right to counsel and was asking for clarification of [it]."  *Id.* at 894.  The police said that a *disadvantage* of having a lawyer present is that she will prevent the suspect from answering incriminating questions—which is actually an *advantage* of invoking the right to counsel.  *Id.*  The

police also said that "honesty wouldn't hurt [the suspect]," contradicting the *Miranda* warning that anything a suspect says could be used against her in court. *Id.* No deception in the instant case rises to the level of *Hart*. Officer Barleen did not imply that Defendant would not be hurt by the interrogation. Merely saying that Defendant could be charged with certain crimes is insufficient alone to produce an involuntary waiver; Defendant is an adult with experience in the criminal justice system. *Cf. United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (holding a suspect's admissions voluntary under the Fourteenth Amendment because the police's conduct did not overbear her will, even though the officer banged his fist on the table, accused the suspect of lying, and falsely told her a codefendant implicated her in the crime).

Therefore, because Defendant knowingly and voluntarily waived his *Miranda* rights, I recommend allowing the United States to use any statements Defendant made after waiving his rights.[7]

  **C.**  *There are no grounds to suppress the gun, ammunition, and holster.*

    *1.*  *Defendant has no standing to challenge the seizure of the handgun because, having abandoned it, he had no privacy interest in it.*

A person has a Fourth Amendment interest only in items or places in which she has a reasonable expectation of privacy. *United States v. Jones*, 565 U.S. 400, 406 (2012); *Katz v. United States*, 389 U.S. 347 (1967). "What a person knowingly exposes to the public, even in his

---

[7] Defendant claims that "[t]he circumstances also indicate that his statements were not voluntarily made." [Doc. 17] at 13. Such language could indicate that he challenges the statements he made after the *Miranda* warnings as involuntary under the Fourteenth Amendment's Due Process Clause. Because he only argues that his "statements were obtained in violation of the Fifth Amendment," the Court will not construe his statement as incorporating a Due Process Clause argument. To the extent he could argue the Due Process Clause requires suppression of any statements he made, his statements were not involuntary because, among the reasons listed why his waiver was voluntary, he never confessed to any crime. Therefore, the police did not overcome Defendant's will. *See Perdue*, 8 F.3d at 1466 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

own home or office, is not subject to Fourth Amendment protections." *Katz*, 389 U.S. at 351. Similarly, "[w]hen an individual *voluntarily* abandons property, they forfeit any expectation of privacy in it that they might have had." *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983) (emphasis added). "Mere 'police pursuit or investigation at the time of abandonment does not itself render the abandonment involuntary,'" however. *United States v. Easley*, 293 F. Supp. 3d 1288 (D.N.M. 2018) (quoting *Jones*, 707 F.2d at 1172). Whether a person abandons property depends on (1) whether she subjectively abandoned the item and (2) whether her words and actions indicated she objectively no longer had a privacy interest in the item. *United States v. Denny*, 441 F.3d 1220, 1227 (10th Cir. 2006); *see Jones*, 707 F.2d at 1172 (holding that the defendant abandoned a satchel outside the rear of a building by placing it there after police ordered him to halt and disclaiming ownership of the satchel). "Subjective intent aside, 'one who disclaims ownership is likely to be found to have abandoned ownership . . . [and] is tantamount to declaring indifference, [which] thus negates the existence of any privacy concern'" in the item. *Denny*, 441 F.3d at 1227 (quoting *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994)) (collecting cases from the First, Sixth, Seventh, and D.C. Circuits).

Here, Defendant abandoned the gun by placing it in a public alley, knowingly exposing it to the public. When he spoke with Officer Barleen in the police car, he repeatedly stated that he did not have a gun and would not touch a gun because he was on parole. Pl.'s Ex. 4 at 03:50, 05:25. Like the defendant's disclaimer of ownership in *Jones*, Defendant's statement indicates that he subjectively and objectively had no privacy interest in it. Regardless, Defendant's placing of the gun in plain view in a public alley objectively indicates he no longer had a privacy interest in it.

Defendant's only argument against abandonment is that he did not voluntarily abandon the gun because his abandonment was in response to a Fourth Amendment violation. [Doc. 29] at 13. The Court disagrees for two reasons. First, as explained in Section III.A.1., Officer Barleen's detention of Defendant did not violate the Fourth Amendment. Second, even if the detention did violate the Fourth Amendment, Defendant abandoned the gun *prior to* the *Terry* stop. Defendant walked into Ms. Salazar's back yard before Officer Barleen stopped him. Officer Barleen first seized Defendant when, *after* Defendant returned from the back yard, he ordered him to stand on the sidewalk. Mere police investigation does not alone render abandonment involuntary. That Defendant may have seen Officer Barleen momentarily block the driveway before the *Terry* stop occurred is irrelevant. Because Defendant abandoned the gun, he had no reasonable expectation of privacy in it and cannot challenge its seizure under the Fourth Amendment. I therefore recommend allowing the United States to use the gun, ammunition, and holster as evidence at Defendant's trial.

2. *There is no factual nexus between Defendant's detention and the seizure of the gun.*

Finally, assuming *arguendo* that Officer Barleen unlawfully seized Defendant, I would not recommend that the gun and ammunition (or the fingerprints found on them and the holster) be suppressed because Officer Barleen did not discover them as a result of Defendant's detention. The Court must exclude evidence police discovered as a direct or indirect result of an unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Not all evidence found after a Fourth Amendment violation, however, is the fruit of a poisonous tree. *Id.* at 488. The Defendant bears the burden of proving that a "factual nexus between the illegality and the challenged evidence" existed. *United States v. Nava-Ramirez*, 201 F.3d 1128, 1131 (10th Cir.

2000) (quoting *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980)). "In order to show such a factual nexus . . . '[the defendant] must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct.'" *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (emphasis added) (quoting *Nava-Ramirez*, 210 F.3d at 1131). Only after the defendant proves this nexus must the government prove that "the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Nava-Ramirez*, 210 F.3d at 1131.

Officer Barleen had reason to search Ms. Salazar's back yard based on his observation of Defendant walking into the back yard. He observed this as he arrived at the house, i.e., *before* he detained Defendant. Nothing in his conversation with Defendant before he searched the alley alerted him to the presence of the gun or even the alley itself. Officer Barleen therefore discovered the gun independently from the constitutional violation. Defendant does not argue *how* Officer Barleen used information he gleaned from Defendant's seizure to find the gun. He merely argues that "[a]s a result of the unlawful seizure, detention, and interrogation, Officer Barleen obtained evidence and statements" that "must be suppressed as the 'fruit of the poisonous tree.'" [Doc. 29] at 14 (quoting *Wong Sun*, 371 U.S. at 488). This bare recitation of the elements of the exclusionary rule is insufficient to maintain Defendant's burden to prove a factual nexus.

Because no factual nexus exists between Defendant's detention and Officer Barleen finding the gun, the gun was not the fruit of the poisonous tree. Therefore, I recommend that the physical evidence found near the scene of Defendant's arrest not be suppressed.

Defendant also claims that, due to the *interrogation* of Defendant, Officer Barleen obtained statements that the Court must exclude. [Doc. 29] at 14. The fruit of the poisonous tree doctrine, however, treats evidence obtained from a Fourth Amendment violation differently from evidence obtained from a violation of the Fifth Amendment. Despite Officer Barleen's improper interrogation of Defendant after handcuffing him, the United States may still use the statements to impeach Defendant on cross-examination and may introduce "physical evidence resulting from voluntary statements" made without *Miranda* warnings. *United States v. Patane*, 542 U.S. 630, 633–34, 639–40 (2004) (plurality opinion). The United States would merely be barred from using statements obtained as a result of the *Miranda* violation in its case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

IV.    *CONCLUSION*

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion to Suppress [Doc. 17] be **GRANTED** as to all statements obtained from Defendant between 11:28–12:19 of Pl.'s Ex. 1. In all other respects, I recommend that Defendant's Motion to Suppress be **DENIED**.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

**STEPHAN M. VIDMAR**
**United States Magistrate Judge**