# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                                                    **No. 18-cr-2752 KG**

**JEFFREY GOEBEL,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter comes before the Court on the Magistrate Judge's Proposed Findings and Recommended Disposition ("PF&RD"), [Doc. 35], filed on November 15, 2018. The Honorable Stephan M. Vidmar, United States Magistrate Judge, recommended that the Court grant in part and deny in part Defendant's Motion to Suppress [Doc. 17]. Defendant timely objected to the PF&RD on November 29, 2018. [Doc. 37]. The United States responded to Defendant's objections on December 6, 2018. [Doc. 38]. Having reviewed the PF&RD, Defendant's objections, the United States' Response, and the entire record, I overrule all objections and adopt the PF&RD.

## I.    *STANDARD OF REVIEW*

At a suppression hearing, the United States bears the burden of proof by a preponderance of the evidence to show that the challenged action did not violate the defendant's Fourth or Fifth Amendment rights. *United States v. Matlock*, 415 U.S. 164, 177 (1974). The Court views the evidence in the light most favorable to the United States. *See, e.g., United States v. Turner*, No. 13-40050-01-JAR, 2013 WL 5727404, at *9 (D. Kan. Oct. 22, 2013) ("While the Court is

cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record"); *United States v. Ortega*, No. 12-20580-CR-MOORE/TORRES, 2012 WL 12894242, at *4 (S.D. Fla. Dec. 3, 2012) ("[V]iewing the facts adduced at the suppression hearing in the light most favorable to the government . . . .").

Once a party has filed objections to a magistrate judge's PF&RD, the Court must consider those objections de novo. Fed. R. Crim. P. 59(b)(3). "The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." *Id.*

## II.   *FINDINGS OF FACT*

The Court adopts Judge Vidmar's factual findings. The following facts are either undisputed or taken in the light most favorable to the government. City of Roswell Police Department ("RPD") Officer Alex Barleen patrolled the area of South Michigan Avenue and West Hendricks Street in Roswell at approximately 2:45 a.m. on June 22, 2017. Tr. at 6–7. He heard dispatch radio traffic describing a reckless driver driving a sedan with no headlights on. Tr. at 7. Around 3:30 a.m., he proceeded through the intersection of West McGaffey Street and South Washington Avenue. Tr. at 8, 52. He observed a sedan approach the stop sign behind him, suddenly activate its blinker, and turn right onto Washington Avenue. Tr. at 8, 53. Barleen followed the car as it made several subsequent turns, eventually turning onto Adams Avenue. Tr. at 10, 87. He saw the sedan turn into the driveway of 1504 South Adams Avenue. Tr. at 10–11.

Barleen observed the driver exit the sedan and walk quickly into the back yard of the house. Tr. at 12, 62. Barleen then parked his patrol unit behind the sedan in order to monitor the driver's

whereabouts and to read the sedan's license plate. *See* Tr. at 14, 18, 20. His patrol unit momentarily blocked the driveway for about ten seconds. Tr. at 20–21. After noting the sedan's license plate, Barleen moved his patrol unit so that it no longer blocked the driveway. *Id.* Defendant was still in the back yard at this point. *Id.*

As soon as Barleen moved his patrol unit, the sedan's front passenger, Ricky Riley, exited the sedan and approached Barleen's vehicle. Tr. at 21. Barleen testified this is sometimes done to distract his attention from somebody else on the scene. Tr. at 22, 89–90. When questioned, Riley could not tell Barleen the residence's address. Tr. at 22. Barleen noted that there were no lights on in the house. Tr. at 60. As he spoke to Riley, Barleen observed a van parked in the driveway. One of the side doors on the van was open. Tr. at 27. At this point, Defendant returned from the back yard. Tr. at 22. He started to get back into his car. *Id.* Barleen instructed him to stay out of the car and told Defendant and Riley to stand on the sidewalk. *See* Tr. at 22–23, Pl.'s Ex. 1 at 01:03.

Barleen asked them whether they knew the address of the residence, but neither could provide it. Pl.'s Ex. 1 at 00:53–02:23. During this conversation, Barleen told them that they did not "belong" at the house. *Id.* at 02:23. At the evidentiary hearing, Barleen testified that he meant that he did not believe they had authorization to be on the property. Tr. at 25. Defendant told Barleen that they were there to give a friend, Joseph, a ride to work. Tr. at 71–72; Pl.'s Ex. 1 at 01:19. According to Defendant, Joseph had told him to go to the side door when he arrived. Pl.'s Ex. 1 at 02:48.

As Barleen spoke with the two men, a second RPD officer—Officer Arroyo—arrived. Tr. at 33–34; Pl.'s Ex. 1 at 03:43; *see* Pl.'s Ex. 2. Arroyo watched the two men while Barleen spoke

with the second passenger of the sedan, Crystal Rosas. Pl.'s Ex. 1 at 03:43. She told Barleen that Defendant appeared to be "really, really scared" when he pulled into the driveway. *Id.* at 14:02. Rosas claimed that she "just asked for a ride" to the place she was staying, but could state neither that place's address nor the name of the friend Defendant was picking up. *Id.* at 04:26. Barleen radioed the three suspects' information to RPD dispatch, who reported that Defendant had prior felony convictions and was currently on probation. *Id.* at 05:14–06:06; Pl.'s Ex. 2 at 05:42–05:59.

Barleen then knocked on the door to the house and spoke with the homeowner, Eva Salazar. Tr. at 28; Pl.'s Ex. 1 at 07:23, 09:00. Salazar denied knowing any of the sedan's occupants. Pl.'s Ex. 1 at 09:12–09:22. She also denied that anyone named Joseph was at her house. *Id.* at 09:20. She thought she had closed the van's door before she had gone to bed. *Id.* at 09:26. Salazar told Barleen that she did not hear anyone knock before Barleen did so. *Id.* at 09:28. She gave Barleen permission to search the van and her back yard, while also telling him that she did not wish to pursue trespass charges against Defendant. *See id.* at 09:54–10:20.

After speaking with Salazar, Barleen returned to Defendant and placed him in handcuffs. *Id.* at 10:39. As he patted him down for weapons, Barleen told Defendant that he was being detained for suspicious activity, possible vehicle burglary, and criminal trespass. *Id.* at 11:00. Defendant denied any wrongdoing. *Id.* Barleen said that "nobody belongs here at this house." *Id.* at 11:27. Defendant repeated that he had gone to the house to pick up a friend for work. Barleen responded that "none of your stories match." *Id.* at 11:30. Barleen told Defendant that he saw him "dart into the back" of the property. *Id.* at 11:35. He also told Defendant that the door on the van was not open when Defendant arrived at the house. *Id.* When Defendant denied opening the van's door, Barleen told him that his story made no sense. *Id.* at 11:45. Defendant stated that he

had no reason to lie. *Id.* Barleen did not Mirandize Defendant prior to this conversation. He placed Defendant in a patrol unit while Arroyo secured Riley in a separate patrol unit. *Id.* at 12:02; Pl.'s Ex. 2 at 08:08–11:00.

Barleen then searched the premises. He found no sign of criminal activity in the van. Tr. at 30. While searching the back yard, Barleen noticed a gate leading to a public alley. Tr. at 31–32. The gate was ajar. Tr. at 31. He went through the gate and immediately observed a handgun and holster on the ground in the middle of the alley, approximately six to seven feet from the gate. *See id.* Barleen called dispatch to ask for assistance in securing the firearm. Tr. at 32.

Barleen returned to Defendant once the gun and holster had been secured. He read Defendant his *Miranda* rights. Pl.'s Ex. 4 at 1:22. Defendant told Barleen that he had been read his rights before and understood them. *Id.* Defendant was still willing to talk to Barleen. *Id.* He denied possessing the firearm. *Id.* He denied any knowledge of the firearm whatsoever. *Id.* Barleen placed him under arrest for being a felon in possession of a firearm. *Id.* at 04:00–05:10. This interview occurred while Defendant sat handcuffed in the back of a patrol unit. Barleen stood outside the car talking to Defendant with the rear passenger door open. Defendant appeared to be of at least average intelligence, though Barleen did not inquire about his education. Tr. at 42–43. The interview took approximately five to six minutes. Barleen never threatened Defendant or physically punished him. Nor did Barleen unholster his gun. Tr. at 42–44; Pl.'s Ex. 4 at 01:20–06:37.

Barleen transported Defendant to the RPD booking area where he interviewed him again. He read Defendant his *Miranda* rights again, and Defendant affirmed that he understood his rights and was willing to talk. Pl.'s Ex. 5 at 00:55–01:05. Barleen told Defendant he could be charged

with a number of crimes, including reckless driving, vehicle burglary (of the van in the driveway), criminal trespass, tampering with evidence, and felon in possession. *Id.* at 1:05–1:45. Defendant reiterated that he knew nothing about the gun. *Id.* at 01:50–02:25. Defendant was not handcuffed during this interview. Tr. at 44; s*ee* Pl.'s Ex. 5. Barleen conducted the interview standing; Defendant sat on a bench. *See* Pl.'s Ex. 5. Barleen had locked his gun in his patrol unit prior to questioning Defendant. Tr. at 44. At no time did Barleen threaten Defendant physically. *See* Pl.'s Ex. 5. At the conclusion of the interview, Barleen allowed Defendant to use the phone in the booking room. *Id.* at 09:00.

The United States filed an Indictment on August 22, 2018, charging Defendant with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). [Doc. 4].

Defendant objects to two factual findings and 18 omissions of a factual finding. With respect to the latter objections, Defendant never explains *why* the omission of a factual finding would change the result of the PF&RD. For example, Defendant objects to "the omission of a finding that beyond the gate was a patio with a side door to the house." [Doc. 37] at 4. Defendant's argument as to how such a finding would result in a different outcome is unclear, and the Court cannot determine why he objected to the omission of certain alleged facts. The Court therefore overrules Objections 1 and 4–20.

Defendant's two specific objections to factual findings are overruled. They each relate to Barleen's observations of Defendant's car prior to arriving at the house. Defendant objects to Proposed Finding of Fact No. 8, which states, "In Officer Barleen's experience, motorists who intend to turn at an intersection typically activate their turn signals prior to reaching the stop sign."

[Doc. 35] at 3 (citing Tr. at 88–89). Defendant objects because "Officer Barleen did not specifically testify that [Defendant's] actions and the circumstances were suspicious." [Doc. 37] at 2. This factual finding does not turn on whether Barleen thought the actions were suspicious. Therfore this objection is overruled.

Defendant's next objects to Proposed Finding of Fact No. 9, which states, "Officer Barleen considered the sudden signal and subsequent turn, in conjunction with the previous radio traffic regarding a reckless driver, suspicious." [Doc. 35] at 3 (citing Tr. at 88–89). Defendant argues that Barleen never testified that he found these actions suspicious. [Doc. 37] at 2. The record of the hearing indicates otherwise. Judge Vidmar asked Barleen, "Why is [a quick turn signal] suspicious?" Tr. at 88. Barleen answered, "That's not normally what we see." *Id.* Barleen testified that he found this action suspicious. This objection is therefore overruled.

## III.    *CONCLUSIONS OF LAW*

On de novo review, the Court agrees with Judge Vidmar that, with the exception of the sidewalk interrogation after Barleen handcuffed Defendant, but before reading him his *Miranda* rights, the police did not violate Defendant's Fourth or Fifth Amendment rights. Defendant's objections can be grouped into six categories: (1) Barleen did not have reasonable suspicion to detain him, (2) Barleen unconstitutionally extended the length of the *Terry* stop, (3) Defendant was in custody during the *Terry* stop and did not receive *Miranda* warnings, (4) Defendant's waiver and statements made after receiving *Miranda* warnings were involuntary, (5) he has standing to challenge the gun's seizure because he involuntarily abandoned it, and (6) all evidence and statements were the fruit of the poisonous tree. Defendant's objections fail to address many

of Judge Vidmar's conclusions and do not compel a different result. Each of Defendant's objections is overruled.

### A. *Barleen did not violate the Fourth Amendment by detaining Defendant.*

Defendant objects to Judge Vidmar's findings concerning the Fourth Amendment on two grounds. First, he argues that Barleen lacked reasonable suspicion to detain him because Barleen did not see him commit any traffic violation or other offense. Defendant argues even if Barleen had reasonable suspicion, his explanation that he was picking up a friend should have dispelled any such suspicion. [Doc. 37] at 5. Second, he argues that Barleen unconstitutionally extended the length of the *Terry* stop by continuing to question him after he explained that he was at the house to pick up a friend for work. *Id.* at 5–6. The Court overrules both objections.

#### 1. *Barleen had reasonable suspicion that Defendant was engaged in criminal activity when he saw Defendant walk into the back yard of a house at 3:30 a.m. in a high-crime area.*

After reviewing the totality of the circumstances, Judge Vidmar determined that Barleen had reasonable suspicion to detain Defendant because he observed Defendant walk into the back yard of a private residence at approximately 3:30 a.m. [Doc. 35] at 16–17. An officer may perform a brief, investigatory stop when the circumstances available to him at the time of the stop provide reasonable suspicion that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 675–76 (2000). The circumstances surrounding a stop "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Leyba*, 627 F.2d 1059, 1063 (10th Cir. 1980) (quoting *United States v. Vasquez*, 612 F.2d 1338, 1343 (2d Cir. 1979)). Courts must therefore "accord deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Williams*, 271 F.3d 1262, 1268 (10th

Cir. 2001). Reasonable suspicion "is not, and is not meant to be, an onerous standard . . . a factor may raise objectively reasonable suspicion even if it is not be itself proof of any illegal conduct and is quite consistent with innocent travel." *United States v. Syebels*, 526 F. App'x 857, 858 (10th Cir. 2013) (unpublished) (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)).

The Court begins by noting that Defendant's conduct after he pulled into the driveway at the house was suspicious. As Judge Vidmar noted, it is highly unusual for a person to walk into the back yard of a house at 3:30 a.m. [Doc. 35] at 14. Defendant never approached the front door of the house. Such activity indicates that the suspect could be trespassing or in the process of burglarizing the house, especially given the late hour. *See United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009). Defendant argues that he did not commit a traffic violation, [Doc. 35] at 5, but Judge Vidmar did not rely on any traffic violation in finding that reasonable suspicion existed. Reasonable suspicion existed because, once Defendant arrived at the house, his actions were consistent with someone committing a trespass or burglary.

The area's high crime rate also weighs in favor of a finding of reasonable suspicion. Defendant does not dispute that the area surrounding the house is high-crime, a factor courts universally find weighs in favor of reasonable suspicion. *Wardlow*, 528 U.S. at 124; *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012). Defendant objects that Judge Vidmar did not make a finding of the overall crime rate in Roswell. [Doc. 37] at 5. The Court cannot find—and Defendant does not cite—a Tenth Circuit case requiring a finding of the area's overall crime rate in order to credit an officer's testimony that a neighborhood is high-crime. Barleen testified that he has personally responded to more than 100 calls in the area for crimes including burglaries and

property crimes. Tr. at 13–14. The Tenth Circuit requires nothing more. *See United States v. Connor*, 699 F.3d 1225, 1231 (10th Cir. 2012). Defendant's objection is overruled.

Defendant objects on the ground that his explanation to Barleen that he was at the house to pick a friend up for work should have dispelled any reasonable suspicion. He does not, however, respond to any of Judge Vidmar's conclusions detailing why his explanation was suspicious. Defendant could remember neither the address of the house in question nor the friend's surname. Pl.'s Ex. 1 at 1:23. Defendant claims that his friend worked at a 24-hour cheese factory, but most jobs do not require a person to work at 3:30 a.m. Importantly, even if this explanation was true, the officer "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). The Court therefore assigns little weight to Defendant's explanation and overrules Defendant's objection.

Finally, Defendant does not object to Judge Vidmar's findings that he drove evasively once he saw Barleen and that Riley's statements to Barleen were suspicious because they could have been designed to distract Barleen from Defendant's activities in the back yard. *See* [Doc. 35] at 15–16. Each of these actions weighs in favor of reasonable suspicion. *See United States v. Briggs*, 720 F.3d 1281, 1286 (10th Cir. 2013) (finding that evasive activity contributes to reasonable suspicion); *United States v. Barbee*, 968 F.2d 1026, 1028–29 (10th Cir. 1992) ("The behavior of persons in the car is also relevant. . . . An agent's belief that passengers are "'slouching down" to avoid detection' may create reasonable suspicion.") (quoting *Leyba*, 627 F.2d at 1061, 1063)).

Based on the totality of the circumstances, reasonable suspicion therefore existed to detain Defendant. To the extent there could have been an innocent explanation for Defendant's actions,

the Court will defer to an officer's ability to distinguish between innocent and suspicious activity. *Williams*, 271 F.3d at 1268. The Court overrules Defendant's objections and adopts the proposed conclusion that Barleen had reasonable suspicion to stop Defendant.

### 2. *Barleen did not unconstitutionally prolong Defendant's detention.*

To determine if an officer unconstitutionally prolonged the length of a *Terry* stop, a court determines whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The duration of the stop must reasonably relate to the circumstances which justified it. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). The Supreme Court cautions that "the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Sharpe*, 470 U.S. at 686–87 (citation omitted). The "question is . . . whether the police acted unreasonably in failing to recognize or pursue" some alternative method of detention. *Id.* at 687.

In this case, Barleen diligently pursued his investigation of Defendant. Roughly two minutes and 40 seconds after Barleen began the *Terry* stop, Arroyo arrived. *See* Pl.'s Ex. 1 at 00:55–03:45. Thirty seconds after Arroyo's arrival, Barleen questioned the second passenger in the car, then spoke with Salazar and began his search of the back yard and alley. *See* Pl.'s Ex. 2 at 00:45–01:15. He found the gun roughly 14 minutes after Arroyo arrived and after searching the back yard for about two minutes. *See* Pl.'s Ex. 1 at 03:45–17:20. One minute and 25 seconds later, Barleen radioed for assistance in securing the gun. *Id.* at 18:45. Once Barleen found the gun, he was justified in prolonging the detention to secure newly found evidence. He reasonably

waited for Arroyo to arrive before conducting the search because he otherwise would have had to leave two suspects alone on the opposite side of the house, potentially allowing them to escape. *Cf. Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir. 2013) (stating that, in the excessive force context, an officer's decision calculus changes when "this is not the case of a single officer attempting to control and detain multiple suspects"). A 14-minute search is reasonable under these circumstances.

Defendant objects on the ground that "the stop should have ended when Mr. Goebel explained that he was there to drive a friend to work," [Doc. 37] at 5, but, as explained above, this explanation only contributed to Barleen's reasonable suspicion. "Police officers are allowed to expand the investigation if routine questioning raises further suspicions." *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010). The Court therefore overrules Defendant's objection.

Defendant next objects because "[t]here were no objective facts to support reasonable suspicion that criminal activity was afoot." [Doc. 37] at 6. This argument is irrelevant to the detention's *length*; Defendant merely rehashes his arguments for why Barleen did not have reasonable suspicion. Defendant claims that Barleen could not have known that Defendant had no permission to enter the property, *id.*, but Barleen saw Defendant walk quickly to the back yard of the house during the middle of the night.[1] Such circumstances reasonably suggest that Defendant

---

[1] Defendant states in his Objection to the PF&RD that Barleen could not have known he did not have permission to be on Salazar's property because she did not post a "No Trespassing" sign. [Doc. 37] at 6. Yet, New Mexico criminal trespass law states that if a "No Trespassing" sign does not exist, then the "remaining inquiry is whether there was sufficient *circumstantial evidence* for the jury to conclude that [the defendant] knew he was not permitted to enter" the property. *State v. Merhege*, 2017-NMSC-016, ¶ 10 (emphasis added). The circumstantial evidence here— including his evasive behavior prior to arriving at the house and the time of night—reasonably suggested that Defendant did not have permission to enter the back yard. *See id.* ("Merhege entered the yard at around 3:40 a.m. for the purpose of evading a pursuer. The jurors could reasonably have concluded that Merhege knew he did not have permission to enter the property in this manner because his entry did not comport with social norms in the community . . . . [and this finding] was supported by the fact that the intrusion here occurred in the dead of the night.").

had a criminal purpose in mind. Though Defendant claims that "[n]othing was missing from the van so the objective facts did not support an inference of auto burglary," [Doc. 37] at 6, Barleen could not know that "nothing was missing from the van" until he searched it. Barleen's search was therefore reasonable in relation to Defendant's suspicious activities in Salazar's driveway and back yard. The Court will adopt the proposed conclusion of law that Barleen did not unconstitutionally prolong Defendant's detention.

> B. *Barleen violated Defendant's Miranda rights by interrogating him after handcuffing him—but before Mirandizing him—on the sidewalk. No other interrogation by Barleen violated the Fifth Amendment.*

Defendant objects to Judge Vidmar's conclusion that he was not in custody for *Miranda* purposes when he was told to stand on the sidewalk. [Doc. 37] at 6–7. Defendant then objects to the conclusion that, even after Barleen Mirandized him, Barleen's interrogation tactics did not produce an involuntary *Miranda* waiver or involuntary statements. *Id.* at 7–9. The Court overrules each objection.

> 1. *Defendant was not in custody until Barleen handcuffed him.*

The police must read a suspect his *Miranda* rights before subjecting him to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether a person is in custody turns on how the circumstances surrounding the interrogation "'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). This inquiry asks whether the suspect would reasonably believe his freedom to leave "had been curtailed to a 'degree associated with a formal arrest.'" *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Not

every detention amounts to *Miranda* custody. "Case law is well established that a defendant is not in custody [during a *Terry* stop] and therefore *Miranda* warnings need not usually be given." *Id.* at 1516. A *Terry* stop may transform into custody, however, if the police "take highly intrusive steps [such as handcuffing and questioning at gunpoint] to protect themselves from danger." *United States v. Thyberg*, 411 F. App'x 181, 185 (10th Cir. 2011) (unpublished) (alteration in original) (quoting *United States v. Eckhart*, 569 F.3d, 1263 1276 (10th Cir. 2009)).

Judge Vidmar relied on the following factors to find that Defendant was not in custody until Barleen handcuffed him, including: Barleen never threatened Defendant with force, never ordered him to the ground, only two officers were at the scene before handcuffing Defendant, the short length—only a few minutes—of questioning, and the public location of the interrogation. Defendant does not directly contest any of these findings. For the reasons stated in the PF&RD, *see* [Doc. 35] at 18–22, the Court agrees with Judge Vidmar's conclusion.

Defendant objects that, because Barleen "took charge of the scene" by ordering him to stand on the sidewalk, he placed Defendant in custody. [Doc. 37] at 7. The standard for determining whether a suspect is in custody, however, is not whether the police took charge of the scene. Though Barleen ordered Defendant to stand on the sidewalk, such an order is consistent with every *Terry* stop and traffic stop. If the Court were to accept Defendant's argument, then police would have to Mirandize every person stopped for a mere traffic offense—an argument rejected by the Supreme Court. *See Berkemer v. McCarty*, 468 U.S. 420, 439–41 (1984).

Defendant argues that Barleen's "highly intrusive and accusatory questions" indicated that Defendant was in custody. [Doc. 37] at 7. The court must weigh the nature of the officer's questioning when determining *Miranda* custody. *See Griffin*, 7 F.3d at 1518. During a *Terry* stop,

an "officer may ask the detainee a moderate number of questions to determine [her] identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439. Barleen asked Defendant about the purpose of his visit, his identity, the identity of his friend that he allegedly drove to pick up, and his activities in the back yard. Pl.'s Ex. 1 at 01:04–03:44. This line of questioning is not unnecessarily intrusive or accusatory. This objection is overruled.

Finally, Defendant objects because Barleen did not tell him that he could refrain from answering questions or leave. [Doc. 37] at 7. The Tenth Circuit has held that if an officer does not inform a suspect she may leave or refuse to answer questions, that weighs in favor of finding that the suspect was in custody, *Griffin*, 7 F.3d at 1518. However, this factor is not dispositive; the court must examine "the totality of the circumstances." *Id.*; *see United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("Although these factors [including whether a suspect is told she could refrain from answering] are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others."). Even if Barleen never told Defendant he was free to leave, the totality of the circumstances demonstrates that the encounter did not amount to custodial interrogation.

The totality of the circumstances indicates that Defendant was not in custody until Barleen handcuffed him. This finding comports with the traditional rule that *Terry* stops do not require *Miranda* warnings. The Court will therefore adopt Judge Vidmar's finding that Defendant was not in custody until handcuffed.

> 2. *Defendant knowingly and voluntarily waived his* Miranda *rights once they were read them to him.*

Defendant objects to Judge Vidmar's conclusion that he voluntarily waived his *Miranda* rights. Defendant argues that "Officer Barleen used coercive tactics to compel [him] to talk." [Doc. 37] at 8. The Court disagrees. Whether a suspect validly waives his *Miranda* rights depends on a two-step analysis. First, the suspect must knowingly and intelligently waive his rights. The question is whether he was fully aware of the nature of the rights being abandoned and the consequences of abandoning them. *Berghuis v. Thompkins*, 560 U.S. 370, 383–86 (2010). Second, the waiver "must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* at 382 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). If the suspect takes a course of conduct inconsistent with his *Miranda* rights, he waives their protections. *Id.* at 385–86. A waiver is involuntary only when the suspect's "will was 'overborne by the circumstances surrounding the giving of a confession.'" *United States v. Varela*, 576 F. App'x 771, 777 (10th Cir. 2014) (unpublished) (quoting *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004)). Whether the officer overwhelmed the suspect's will depends on the totality of the circumstances, including "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010).

Defendant knowingly and intelligently waived his *Miranda* rights. Defendant does not explain why Judge Vidmar's finding on this issue is incorrect. Barleen read Defendant his *Miranda* rights twice: once in the patrol unit and once in the station house. Defendant said he understood his rights each time. Defendant also has a criminal history. If a suspect has "prior experience with the criminal justice system," a knowing waiver becomes more likely because "the

concepts encompassed by *Miranda* [are] not foreign to him." *Mullin*, 379 F.3d at 934. Defendant even told Barleen that he had been read *Miranda* rights previously, and he still wished to talk. Pl.'s Ex. 4 at 01:25. He therefore knowingly waived his rights.

Defendant objects to Judge Vidmar's finding that he voluntarily waived his *Miranda* rights, arguing that Barleen's coercive and deceptive tactics caused him to waive the rights. [Doc. 37] at 7–8. Yet, even if Barleen engaged in aggressive or deceptive tactics to convince him to talk, those tactics did not overwhelm Defendant's will. Defendant never confessed to any crime and repeatedly denied owning the gun. *See* Pl.'s Ex. 4; Pl.'s Ex. 5. Though Barleen accused Defendant of lying and said he could charge Defendant with various crimes, no evidence exists that these actions caused Defendant's will to be overborne. In a case cited by Defendant, the Tenth Circuit agreed: "When the government obtains incriminating statements through acts, threats, or promises *which cause the defendant's will to be overborne*, it violates the defendant's Fifth Amendment rights . . . ." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). Merely threatening to charge Defendant with various crimes does not make a waiver involuntary. *Cf. Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("The fact that police misrepresented the statements [the suspect's cousin] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible."); *United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006) ("It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997), *overruled on other grounds as recognized in Estate of Papadakos v. Norton*, 663 F. App'x 651, 657 (10th Cir. 2016) (unpublished)); *United States v. Duran*, No. 14-cr-3762

MCA, 2017 WL 5186355, at *2 (D.N.M. Nov. 8, 2017) ("[M]isrepresentations of fact, such as an overstatement of the strength of the government's evidence, are generally tolerated.").[2]

The totality of the circumstances indicates that Barleen did not overwhelm Defendant's will. Defendant took a course of conduct inconsistent with his *Miranda* rights by talking about his actions at the house. He is an adult; he was 31 at the time of the incident. [Doc. 25] at 9. Barleen never threatened Defendant with violence. He informed Defendant of his *Miranda* rights twice. Defendant "appear[ed] to be of at least average intelligence." Tr. at 42. Though Defendant objects because Barleen never asked Defendant about his education or intelligence, [Doc. 37] at 8, he cites no cases requiring such an inquiry. Though Defendant argues that the circumstances were coercive because he sat with his back against the wall, *id.*, he does not explain *how* this seating arrangement was coercive. Though Defendant objects because he "was brought to the interrogation in handcuffs," *id.*, he was not wearing them during the interview at the station house. Pl.'s Ex. 5 at 00:10. Defendant's objections are overruled.

Neither did Barleen's conduct render any of Defendant's statements involuntary. The test for determining whether a suspect's statements were involuntary under the Fifth Amendment is the same as that for *Miranda* waiver: whether government acts, threats, or promises overwhelmed the suspect's will. *Griffin v. Strong*, 983 F.2d 1540, 1543–44 (10th Cir. 1993). "Giving the

---

[2] Though the above cases concern the voluntariness of confessions under the Fourteenth Amendment Due Process Clause (or apply Fourteenth Amendment Due Process Clause cases to the Fifth Amendment Due Process Clause), such Fourteenth Amendment cases are applicable to determine the voluntariness of a *Miranda* waiver because the standards are the same. *Colorado v. Connelly*, 479 U.S. 157, 169–70 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."); *Wilson v. Oklahoma*, 363 F. App'x 595, 618 n.22 (10th Cir. 2010) (unpublished) ("The voluntariness inquiry in the Fourteenth Amendment due process is equivalent to the voluntariness inquiry in the *Miranda* waiver context."); *Burnett v. Blackburn*, 160 F. App'x 662, 665 (10th Cir. 2005) ("There is some ambiguity about whether the basis for Ms. Burnett's suppression motion is involuntariness under the Due Process Clause or an invalid waiver. But the result is the same regardless. . . . Both tests require us to consider the totality of the circumstances, including the individual characteristics of the defendant.").

[*Miranda*] warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual staminal, and litigation over voluntariness tends to end with the finding of a valid waiver." *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004) (plurality opinion). Defendant argues that his statements were involuntary for the same reasons he argued his waiver was involuntary. [Doc. 37] at 8–9. The Court rejected those reasons above and agrees with Judge Vidmar that Defendant voluntarily made statements to Barleen.

Therefore, the Court adopts Judge Vidmar's recommendation that Barleen's interrogation of Defendant did not produce an involuntary statement.

C.     *The Court will not suppress the gun, ammunition, and holster because Defendant had no reasonable expectation of privacy in them, and Barleen did not discover this evidence as a result of Defendant's detention or interrogation.*

Defendant objects to Judge Vidmar's findings that he abandoned the gun and that, even if a constitutional violation occurred, no factual nexus existed between the violation and the gun's seizure. [Doc. 37] at 9–12. The Court disagrees and will overrule both objections.

1.     *Defendant abandoned the gun, ammunition, and holster by placing them in plain view in a public alley.*

As Judge Vidmar stated in his PF&RD, a defendant cannot challenge the search and seizure of abandoned evidence. Rather, a defendant may only challenge, under the Fourth Amendment, the search and seizure of evidence in which she had a reasonable expectation of privacy. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). A suspect abandons property when she subjectively and objectively indicates that she no longer has a privacy interest in it. *United States v. Denny*, 441 F.3d 1220, 1227 (10th Cir. 2006). Though abandonment must be voluntary, and cannot be the product of a Fourth Amendment violation, "[t]he existence of police pursuit or investigation at

the time of abandonment does not of itself render the abandonment involuntary." *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983).

Defendant had no reasonable expectation of privacy in the gun, ammunition, and holster after he abandoned them. Defendant does not contest Judge Vidmar's finding that he objectively and subjectively indicated that he no longer had a privacy interest in the items by placing them in plain view in a public alley and disclaiming ownership. Defendant's only objection here is that he abandoned the gun involuntarily because he abandoned it only after Barleen allegedly unlawfully seized him by blocking the driveway. This argument fails. Defendant does not respond to Judge Vidmar's conclusion that Barleen did not seize him by blocking the driveway. Defendant did not return from the back yard until *after* Barleen moved his car so that it *no longer* blocked the driveway. Barleen had not yet seized Defendant because he never submitted to this alleged show of authority. *See California v. Hodari D.*, 499 U.S. 621, 625–39 (1991). The temporary blocking of the driveway is merely a form of police investigation or pursuit, which is insufficient to make an abandonment involuntary. *See United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002); *United States v. Trimble*, 986 F.2d 394, 399 (10th Cir. 1993).

Therefore, Defendant voluntarily abandoned the gun, ammunition, and holster. He cannot challenge their seizure under the Fourth Amendment.

        2.     *Barleen's allegedly unconstitutional conduct did not cause him to seize the gun.*

Judge Vidmar recommended that I find that no nexus existed between the allegedly unconstitutional detention and interrogation of Defendant and Barleen's finding of the gun. [Doc. 35] at 27–28. Judge Vidmar relied on two cases involving vehicular searches—*United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000), and *United States v. DeLuca*, 269 F.3d

1128 (10th Cir. 2001)—in addition to Supreme Court precedent like *Wong Sun v. United States*, 371 U.S. 471 (1963), to make this recommendation. [Doc. 35] at 27–28. Defendant objects to Judge Vidmar's reliance on *Nava-Ramirez* and *DeLuca*, stating that the two cases do not apply here and that because the allegedly illegal police conduct preceded Barleen's search, the exclusionary rule bars introduction of all evidence obtained. [Doc. 37] at 10. The Court disagrees.

Defendant argues for the first time in his Objections that "the framework of *DeLuca* and *Nava-Ramirez* does not fit with the case sub judice." [Doc. 37] at 10. Defendant never argued in his briefing before Judge Vidmar that *DeLuca* did not apply to the instant case, despite the United States' clear use of *DeLuca* in its Response. *See* [Doc. 25] at 10. *DeLuca* applies the same burden-shifting framework as *Nava-Ramirez*: the defendant "must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *DeLuca*, 269 F.3d at 1132 (quoting *Nava-Ramirez*, 210 F.3d at 1131). Because Defendant raises this argument for the first time in an objection to Judge Vidmar's PF&RD, the firm waiver rule bars consideration of it. *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."). The Court therefore adopts Judge Vidmar's recommendation that Defendant did not sufficiently adduce evidence that Barleen's allegedly unconstitutional conduct caused the gun's seizure.

Even without *DeLuca* and *Nava-Ramirez*, Tenth Circuit and Supreme Court precedent clearly requires a causal connection between the allegedly unconstitutional conduct and the seizure. *Hudson v. Michigan*, 547 U.S. 586, 592–93 (2006); *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *United States v. Shrum*, No. 17-3059, 2018 WL 5986370, at *5 (10th Cir.

2018).  Additionally, "[t]he independent source doctrine is one of the exceptions to the exclusionary rule that 'involve the causal relationship between the unconstitutional act and the discovery of evidence.'"  *United States v. Amador*, Nos. 17-3018, 17-3135, 2018 WL 4382199, at *6 (10th Cir. Sept. 14, 2018) (quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016)).  Under the independent source doctrine, if the government did not seize the evidence in question as a result of a constitutional violation, the government may use the evidence seized.  *Strieff*, 136 S. Ct. at 2061.

Here, no causal connection exists between Barleen's alleged constitutional violation and his finding of the gun in the alley.  Barleen observed Defendant walk into Salazar's back yard *before* he detained him.  At no time during the detention did Defendant mention a gun or an alley.  Nothing else in Barleen's conversation with Defendant alerted him to the gun or alley.  Moreover, Barleen's personal observation of suspicious activity prior to the detention provides an independent basis for searching the back yard.  The United States made this argument in its Response, and Defendant did not respond to it.  [Doc. 25] at 10–11.  Judge Vidmar made this conclusion in his PF&RD, and Defendant does not respond to it now.  [Doc. 35] at 28.  Defendant does not argue *how* Barleen used the detention and interrogation to find the gun.  The Court therefore adopts Judge Vidmar's recommendation that the gun, ammunition, and holster were not the fruit of the poisonous tree.

*IV.*     *CONCLUSION*

For the above reasons, the Court overrules each of Defendant's objections to the PF&RD. The Court adopts the PF&RD, [Doc. 35], and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Suppress [Doc. 17]. The Court hereby **SUPPRESSES** all statements made by Defendant between 11:28–12:19 of Pl.'s Ex. 1. In all other respect, Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE